[Civ. No. 1757. Third Appellate District.—September 17, 1917.]

WILLIAM D. STEPHENS, Governor of the State of California, Petitioner, v. JOHN S. CHAMBERS, State Controller, Respondent.

CONSTITUTIONAL LAW — APPROPRIATION OF PUBLIC MONEY FOR PEACE JUBILEE AT VICKSBURG — VALID LEGISLATIVE ENACTMENT — GIFT PROVISION NOT VIOLATED.—The act of the legislature which became effective July 31, 1917 (Stats. 1917, p. 1608), appropriating the sum of fifteen thousand dollars, to be expended by the Governor, in his discretion, for the purpose of assisting to defray the expenses of a public nature incident to the holding of the national memorial reunion and peace jubilee at Vicksburg, Mississippi, in October, 1917, is a valid enactment, and is not within the inhibition of section 31 of article IV of the Constitution, prohibiting any gift of public money to any individual or corporation, and interdicting the appropriation of public money for the purpose or benefit of any corporation or institution not under the exclusive management and control of the state as a state institution.

ID.—REQUIREMENTS OF BILL APPROPRIATING PUBLIC MONEY—CONSTITUTIONAL PROVISION NOT CONTRAVENED. — The act of the legislature which became effective July 31, 1917, appropriating public money for the purpose of assisting to defray the expenses of a public nature incident to the national memorial and peace jubilee at Vicksburg, Mississippi, in October, 1917, is not inconsistent with section 34 of article IV of the Constitution, declaring that no bill making an appropriation of money, except the general appropriation bill shall contain more than one item of appropriation, and that for a single and certain purpose to be expressed therein, because of the indefiniteness of the language of the act.

ID.—EXPENDITURE OF MONEY—DISCRETION OF GOVERNOR—VALIDITY NOT AFFECTED.—The act of the legislature which went into effect July 31, 1917, appropriating public money for the national peace jubilee celebration at Vicksburg, Mississippi, in October, 1917, is not void because it vests the Governor with discretion in the expenditure of the money appropriated.

APPLICATION for a Writ of Mandamus originally made to the District Court of Appeal for the Third Appellate District.

The facts are stated in the opinion of the court.

L. T. Hatfield, for Petitioner.

U. S. Webb, Attorney-General, and Robert W. Harrison, Deputy Attorney-General, for Respondent.

HART, J.—This is an application for a writ of mandate requiring respondent, as state controller, to draw his warrant in favor of petitioner "for such portion of the sum of fifteen thousand dollars, as petitioner may require."

At the recent session of the legislature there was regularly passed an act entitled "An act to provide for the celebration of the national memorial reunion and peace jubilee at Vicksburg, Mississippi, and making an appropriation therefor," which act was by the Governor approved and took effect July 31, 1917 (Stats. 1917, p. 1608). Section 1 thereof reads, in part, as follows: "There is hereby appropriated . . . the sum of fifteen thousand dollars, to be expended by the Governor, in his discretion, for the purpose of assisting to defray the expenses of a public nature incident to the holding of the national memorial reunion and peace jubilee to commemorate the victories and virtues leading to the half century of peace and prosperity to the American nation, and further to strengthen the fraternal ties of amity in the United States," said reunion to be held at Vicksburg in October, 1917, on certain named days.

Section 2 provides that the Governor shall "demand from the state controller, and the state controller is hereby authorized and instructed upon such demand, to draw his warrant in favor of the Governor for the sum of fifteen thousand dollars to be expended by him as above provided, and the treasurer is hereby authorized and directed to pay the same."

By way of answer and return to the petition for a writ of mandate, respondent alleges that said petition "does not state facts sufficient to entitle the petitioner to the relief prayed for," and it is contended that the attempted appropriation of money is contrary to the provisions of section 34, article IV, of the Constitution, which reads: "No bill making an appropriation of money, except the general appropriation bill, shall contain more than one item of appropriation, and that for one single and certain purpose, to be therein expressed."

Thus it will be observed that, so far as the pleadings in this proceeding are concerned, the legality of the statute or appro-

priation in question is attacked upon one ground only. Indeed, in his brief, the attorney-general appears to concede that it is within the constitutional competence of the legislature of this state to appropriate money from the funds of the state for the purpose and object for which the appropriation is made by the act under attack here, for he says: ''In the determination of the validity of this appropriation, it is not necessary to question the objects and purposes of the reunion to be held at Vicksburg. It may well be admitted that such reunion tends to do all of the things expressed in the act as the reasons for holding such reunion. Nor do we here contend that the holding of such reunion is not a matter of state and national importance and one which it might well be to the state's advantage to encourage, even to the extent of appropriations of money to defray the expenses incident thereto.'' In thus expressing himself, the attorney-general doubtless took into consideration, as properly he should, the act of the Sixty-fourth Congress of the United States (Session of 1915–16)—Act Cong. Sept. 8, 1916, c. 464, 39 Stat. 812— whereby money was appropriated for defraying the expenses of the ''National Memorial Celebration and Peace Jubilee at Vicksburg, in the year 1917, by the survivors of the armies of the Tennessee and of the Mississippi,'' who participated in the memorable battle of Vicksburg in the month of July, 1863, for the reason that the appropriation involved in the act whose validity is here challenged is in aid of the purposes and objects of said act of the national Congress. With this concession of the attorney-general that there legally reside in the state the power and the right to appropriate a reasonable amount of the public moneys to aid in the achievement of the purposes of the act of Congress referred to, further consideration herein thereof might well be waived or dismissed, but, in view of the strictness with which the Constitution, by certain provisions therein contained, guards the disposal of the public revenues, and of certain cases expounding those provisions, some observations with respect to that proposition need not be deemed out of place herein.

From what has already been said, it is doubtless plain enough that we are in full accord with the concession of the attorney-general that the legislature may, without offending any of the inhibitory mandates of the Constitution with regard to the appropriations of the public moneys, make such

an appropriation as the one whose legality is challenged in this proceeding; and so we express ourselves because of the conviction that, while the legislature will not be permitted to go beyond the bounds expressly established by the people through their Constitution in the matter of the disposal of the revenues raised for the support of the state government, it would be opposed to and, indeed, conceivably in many instances, subversive of the highest ends and the best interests of, a government whose sovereignty and general policies are outlined and controlled by a written constitution, framed in language necessarily general, if it were found requisite, in constitutional construction, to hold that the terms of the organic law should on all occasions be accepted and applied in their literal sense, or that there are not certain matters incidental and necessary to every well-governed state and its subjects as to which the Constitution is silent, in so far as express language is concerned, and as to which legislation looking to the highest welfare of the governed is absolutely necessary. A written constitution, like a statute, cannot so deal with particulars as to meet or provide for every case or contingency which may arise and of which legislative cognizance is allowable if necessary to the complete enjoyment of those privileges, immunities, and rights which are of the essence, and, indeed, the primary and foremost objects of a government in which, like ours, ultimate sovereignty is in the people themselves. By this we do not mean to say that the limitations or barriers contained in the Constitution against the exercise of legislative power may be set aside or disregarded, or that the intent of the organic law, as it is to be gathered from the instrument itself, shall not in all cases prevail. Nor do we intend thus to imply that the courts, in the construction of a written constitution, may be governed by a change in public sentiment as to any subject to which express attention is given and as to which limitations are fixed by the Constitution. But what we do maintain is that, since a written constitution is intended as and is the mere framework according to whose general outlines specific legislation must be framed and modeled, and is therefore, as stated and as is essentially true, necessarily couched in general terms or language, it is not to be interpreted according to narrow or super-technical principles, but liberally and on broad general lines, so that it may accomplish in full measure

the objects of its establishment and so carry out the great principles of government.

The Constitution of the United States involves a grant and limitation of powers. The federal government, through its Congress, can exercise or exert no power which is not clearly within the grant of the federal Constitution; and this means that Congress may exercise only the powers expressly conferred upon the federal government and such incidental or auxiliary powers as may be essential to the exercise and execution of the powers expressly granted. There is no provision in the national Constitution expressly authorizing the expenditure of public moneys for the purposes and objects stated in the act of Congress above referred to. Nor is there any single provision of that Constitution within the spirit or reason of which does authority for such an appropriation of the public moneys fall. The same is true as to the several acts of Congress pensioning soldiers who fought to uphold the Union in our domestic Civil War. But the latter acts, as well as the one giving rise to the appropriation herein attacked, have never been challenged upon the ground that they were *ultra vires,* or beyond the authority of Congress to enact. Perhaps, by applying to them the touchstone of strict. technical principles of construction, their force as legal enactments might be destroyed. But no such view or method of construction as applied to those acts would by any court be accepted or resorted to. To the contrary, in comparing them with the Constitution, if, indeed, the solution of the question whether they are or are not valid involves a matter of constitutional construction, the courts, if discovering even no indirect or inferential authority for their enactment in the language of that instrument, would nevertheless find ample sanction for them in the general spirit of our national government and in the genius of our political institutions, as outlined and promulgated by the Constitution itself and so sustain them as treating with subjects which clearly fall, not within the letter of the organic law, but within the spirit and reason of those general policies which inhere, and of necessity must inhere, in every government framed and formed upon the lines of enlightened general principles—policies consistent and in harmony with the nature and form of the government as outlined by the primary law of the land and the absence of which would greatly and seriously curtail or

restrict that full enjoyment of the rights of persons and of property which can only come from a government deriving its force from the consent of the governed. It would, indeed, come as a shock if the courts felt compelled to declare and so hold that laws pensioning those who fought to preserve the integrity of the American Union and who, from their accumulated years or disease, are unable to care for themselves, were beyond the power of Congress to enact. Such a judicial fiat would be universally denounced as repugnant to every consideration of governmental duty, obligation, and gratitude. But the motive underlying such legislation is much broader and more far-reaching in its effect upon the government of society than the mere consideration of gratitude. Undeniably, the stability of every civilized government and its political institutions wholly depends upon the patriotism and loyalty thereto of its subjects; hence it is the first duty of every government so to administer its affairs as to inspire in its citizens patriotism and loyalty to the fundamental political principles upon which it is founded, and, to that end, through appropriate policies, teach and exemplify the duty which every citizen owes to his country and its government. Therefore, as stated, legislation which provides for the pensioning of those who have fought the battles of their country for the preservation of its governments and who are in need of assistance involves not only the quality of gratitude, but a just and substantial recognition of services inspired by patriotism, without which battles cannot, as a rule, successfully be fought. If it may be said as to the present crisis with which our country is confronted that patriotism in our citizens has not been aroused, how infinitely worse would the conditions in that regard now be if, in the past, our government had wholly failed in a proper way to recognize and reward, in proper cases, those who had gone to the front and fought our battles in the past?

As we understand the congressional act in aid of the purposes and objects of which the appropriation challenged here was made by our own legislature, the great object and desideratum thereof is to bring about a sentiment of amity between those sections of our country who opposed each other in one of the most bitterly fought domestic wars of which history gives any record; for it is a matter of common historical knowledge that the bitterness of sentiment brought

about between the northern and southern sections by that war existed in full vigor down to the opening of hostilities between this country and Spain, which ended with the late Spanish-American war. And there can hardly be any doubt that that same old feeling in some degree still lingers or exists. The governments of the Union and of the states could adopt no more effective policy for reuniting the two sections in one common political sentiment than that which is involved in and represented by the legislation in question. That the inevitable effect of such a gathering, annually held, as seems to be the policy of Congress, so long as there is a considerable number of the survivors of both sides of that war, will be ultimately to destroy every vestige of that old feeling of antagonism in political sentiment (we here use the word "political" in its more comprehensive sense), there cannot be the shadow of a doubt; and that the inevitable consequence of a condition so brought about will be to establish throughout the whole country a deeper, more abiding and a universal love for our common country and its government, is equally plain. Congress could have exercised no power or established no other policy more conducive to the general welfare of our government and the people, for no government can long exist with its people radically divided in sentiment upon the fundamental political doctrines upon which it is founded.

If, then, Congress, circumscribed as it is within the narrow bounds of granted and limited powers, may rightfully, in the absence of express authority therefor, but solely by the exertion of that power which must inhere in every government if the general welfare is on all occasions and in every emergency to be subserved as intended by the very nature and spirit of our form of government, appropriate moneys from the public revenues for the purpose of accomplishing the great ultimate object of the act in question, why may not a state, essentially a constituent part of the Union—which, indeed, goes to the making of the Union—make a like appropriation as in aid of the object thus to be achieved?

While the governments of the Union and the states are independent of each other, operate within distinctly different spheres, and are designed for the accomplishment of different specific objects, yet, upon general political or governmental policies their interests are common, and what in a political sense stands for the general welfare of the Union necessarily

stands for the general welfare of the states. Unquestionably, the states, as separate entities and as component parts of the Union, are each equally with the Union interested in the crystallization and execution of any policy of the federal Union that will tend to perpetuate the permanency of the latter, for largely if not wholly upon the perpetuity of the Union depends the permanency of the states as governmental organizations. It follows, therefore, that the policy of the general government with respect to the subject matter of the act of Congress above mentioned is necessarily the policy of each of the states, and that within the latter, no less than within the federal government, resides the power of effectuating and applying that policy. In other words, the duty, if it be a duty, of contributing to the carrying out or execution of that policy rests no less upon the states than upon the federal government. And the right of the states to do so does not depend upon any authority vested in them by express language in their constitutions, nor is it to be controlled by the restrictions or limitations upon the legislative power contained in those instruments, but, as in the case of the federal government, arises from that inherent, dormant power which may legally be aroused to action, exerted and applied by all democratic governments, controlled by written constitutions, whenever the exigencies of government imperatively require its exertion and exercise—that power which, in a general sense, is analogous to the general war powers of the federal government, under which, as war measures, the latter may, as it is now doing, properly control trade principles and execute an infinite variety of other acts which, under normal conditions, approach if not in truth involve paternalism in government or unwarranted abridgments of individual rights as assured and guaranteed by the Constitution.

Thus, it is clear, the inhibitions of our state Constitution against any gift of public money to any individual, municipal or other corporation (article IV, section 31), and interdicting the appropriation of public money "for the purpose, or benefit of any corporation, association, . . . or other institution not under the exclusive management and control of the state as a state institution" (Const., art. IV, sec. 22) have no application to this case. Indeed, it has been so held in a decision treating a proposition quite analogous in principle to that submitted for solution here. (*Daggett* v. *Colgan*, 92

Cal. 53, [27 Am. St. Rep. 95, 14 L. R. A. 474, 28 Pac. 51].)
That case involves an interesting and instructive discussion
of the propositions to which we have hereinabove given con-
siderable attention, and we may, therefore, pardonably and
with advantage, reproduce herein an extended excerpt from
the learned opinion therein. It should first be explained that
the legislature of 1891 (Stats. 1891, p. 24) passed an act ap-
propriating a large sum of money to be paid to the California
Commission of the World's Fair Columbian Exposition, held
in the city of Chicago, and to be used by said commission in
the construction of buildings at said fair in which to maintain
an exhibit.of the industrial products of this state and to de-
fray the expenses arising in connection with such exhibit.
The state controller, claiming that the appropriation made
by the act was in direct contravention of that part of section
22, article IV, of the Constitution above quoted herein, de-
clined to draw his warrant in favor of said commissioners on
the fund so appropriated. After discussing that proposition
adversely to the position of the controller, the court, in its
opinion, made these significant observations:

"The defendant further contends that the statute is uncon-
stitutional for the reason that the appropriation thereby made
is not for a public use, such as the state is authorized to make;
that the maintenance of an exhibition of the products of the
state in the manner contemplated does not fall within the
legitimate authority of the state government.

"In passing upon this proposition, it is necessary to bear
in mind that what is for the public good, and what are public
purposes, 'are questions which the legislature must decide
upon its own judgment, in respect to which it is vested with
a large discretion which cannot be controlled by the courts,
except, perhaps, where its action is clearly *evasive*. . . .
Where the power which is exercised is legislative in its char-
acter, the courts can enforce *only* those limitations which the
Constitution imposes; not those implied restrictions which,
resting in theory only, the people have been satisfied to leave
to the judgment, patriotism, and sense of justice of their
representatives.' (Cooley's Constitutional Limitations, 154.)

"It is undoubtedly true that public money can be right-
fully expended only for public purposes, but as well said by
that eminent jurist, Judge Cooley, in delivering the opinion
of the court in *People* v. *Salem*, 20 Mich. 452, [4 Am. Rep.

400] : *'Necessity* alone is not the test by which the limits of
state authority in this direction are to be defined, but a wise
statesmanship must look beyond the expenditures which are
absolutely needful to the continued existence of organized
government, and embrace others which may tend to make
that government *subserve the general well-being of society,*
and advance the present and *prospective happiness and pros-
perity of the people.'*

"In view of these principles of constitutional law, which
are so well settled as to be placed beyond discussion or dis-
pute, it is manifest, we think, that the court is not authorized
to declare the act under consideration void, upon the theory
that the expenditure thereby authorized can in no manner be
considered as tending to promote the public welfare, which
it is one great object of government to secure. The question
whether the public interests of the state would be at all ad-
vanced by an exhibition of its products such as is contem-
plated by the act was an appropriate one for discussion in
the halls of the legislature before its enactment, and for the
consideration of the Governor before approving it, but it is
not one for this court to decide, upon the individual views of
its members concerning the wisdom or expediency of such
legislation.

"There is no difference, except in degree, between the ap-
propriation contained in this act and those which for years
have been made without any question as to their validity, for
the support of the state agricultural fair, and the various dis-
trict agricultural societies throughout the state. The fact
that this exhibit of the products of the state is to be made
without the limits of the state does not change its essential
character, or make it any less an occasion or purpose in which,
in an enlarged sense, it may be said that the people of the state
have an interest. So, also, it would be hard to distinguish
this appropriation in principle from those appropriations
which have been made from time to time for the mainte-
nance of horticultural, viticultural, and other similar com-
missions. None of these, strictly speaking, are required for
the proper administration of the government of the state, and
possibly, in the opinion of many, call for an unjustifiable and
useless expenditure of money. But the power of the legis-
lature to create such commissions has never been doubted.

"We know from the express declaration of the act of Congress authorizing the Columbian Exposition that the purpose of the exposition is to commemorate the four hundredth anniversary of the discovery of America, 'by an exhibition of the resources of the United States of America, their development, and of the progress of civilization in the New World'; and that such exhibition is to be of a 'national and international character, so that not only the people of the Union and of this continent, but those of all nations, as well, can participate.'

"We have no doubt that it was fairly a matter within the power of the legislature to determine whether, as a matter of public policy and as tending to advance the best interests of its citizens, this state should join with its sister states, and with the government of the United States, in celebrating in the way suggested the historical event referred to.

"It has been held in many cases that a municipal corporation has no authority, under the general powers usually given such corporations, to appropriate money for the celebration of the anniversary of important events in the history of our country, such as the Fourth of July (*Hodges* v. *Buffalo,* 2 Denio (N. Y.), 110; *Hood* v. *Lynn,* 1 Allen (Mass.), 103) and the surrender of Cornwallis. (*Tash* v. *Adams,* 10 Cush. (Mass.) 252. See, also, *The Liberty Bell,* 23 Fed. 844.)

"These decisions, however, all rest upon the principle that municipal corporations have no powers except such as are specifically granted by the act of incorporation, or are necessary for the purpose of carrying into effect the powers expressly granted. *But it has never been doubted that the state could confer upon a city or town the authority to celebrate such important events in the history of the country as appeal to the patriotism or higher sentiments of the people, and to tax their citizens to pay the expense thereof.* Thus it was held that the city of Philadelphia had the power under its charter to provide for the entertainment of distinguished visitors upon the occasion of the celebration of the Centennial Anniversary of American Independence. (*Tatham* v. *Philadelphia,* 11 Phila. (Pa.) 276.) So, also, in Massachusetts, by general statutes, the power has been conferred upon towns to celebrate the centennial anniversary of their incorporation (*Hill* v. *East Hampton,* 140 Mass. 381, [4 N. E. 811]), and also to appropriate money for the celebration of holidays, and for

other public purposes.    (*Hubbard* **v.** *Taunton,* 140 Mass. 467, [5 N. E. 157].)

"These cases are authority for the proposition that the state itself, unless restrained by its Constitution, has the power to make appropriations for such purposes, because unless it possesses the power, it could not confer it upon its municipal corporations. Such expenditures are justified under the general power which the state has to provide for the public welfare—the limits of which are perhaps not capable of exact definition—*and are the same in principle as appropriations made for the building of monuments to commemorate great historical events, or for the erection in public places of the statues of those who by common consent are classed among the patriots or benefactors of the nation.*

"Undoubtedly this power may be the subject of great abuse, but this is no argument against its existence. The only protection against reckless and improvident appropriations for public purposes must be found in the character of those intrusted with the power of legislation, and in the integrity and firmness of the chief executive of the state."

Obviously, there is a distinction between the act questioned in the Daggett case and the act involved in this proceeding with respect to the specific objects of the respective appropriations of the public money. Both, however, aim at the accomplishment of the same general object, viz., the promotion of the general public welfare. For, so far as the promotion of the public welfare is concerned, no distinction in importance or effect between the two acts can logically be pointed out. The exploitation of the industrial resources of a state is surely a matter which directly affects and, where such resources are in magnitude such as to demonstrate the natural material wealth and prosperity of the state, promotes the public welfare. No less may be said of public acts looking to the promotion and fostering in the citizens of a state or nation sentiments of patriotism, which, as we have shown, and as is most obviously true, constitutes the essential mainspring of every stable government. What, indeed, would industrial prosperity count for in a country whose government was without the support of the patriotism and loyalty of its subjects? The past political history of Russia, at this writing in the throes of bitter political disturbances and turbulences, may well stand as an answer to the question.

As stated in the opinion in the Daggett case, *supra,* the question whether the public interests of the state as well as of the nation of which the former is an essential part will be advanced by the meeting in reunion at Vicksburg of the survivors of both sides of the Civil War that fought at the battle known in history by the name of that city was an appropriate one for discussion in the halls of the legislature before the appropriation was made by a legislative act, and for the consideration of the executive before approving it. We must assume that the legislature and the Governor had before them facts and data upon which they were enabled to predicate their judgment that the state and the Union would be materially benefited by the reunion and thus the public welfare and general well-being of society subserved. Their conclusion regarding the act cannot, therefore, be impeached by the courts.

There is no language or provision in the statute appropriating the money indicating that any individual will or can, if the appropriation be properly expended, or dispensed according to the face of the act, receive a single cent as a gratuity or by way of assistance, but that the money appropriated shall be expended in such manner as the executive shall determine will the better and the more effectively effectuate the specific objects of the appropriation and the ultimate purpose to be thereby subserved. And herein lies the distinction between the appropriation in question and that considered and properly held invalid by this court in the case of *McClure* v. *Nye,* 22 Cal. App. 248, [133 Pac. 1145]. The act in that case attempted to appropriate the sum of fifteen thousand dollars, out of the state treasury "for the purpose of paying the transportation of certain veterans of the Civil War to Gettysburg, Pennsylvania, on the occasion of the fiftieth anniversary of the battle fought on that battlefield." Obviously, upon the very face of that provision the appropriation amounted to nothing less than a gift of public moneys, and hence flew squarely in the face of the provision of our Constitution against thus disposing of our public revenues. In the present case, as seen, the appropriation is to be used on the occasion of the reunion at Vicksburg for the purpose of effectuating the great, central object of the gathering, as pointed out by the act of Congress and the act here in question, viz., to strengthen the fraternal ties of amity in the United States.

As shown, no express provision is made by the act for the payment of the transportation of veterans or other persons to Vicksburg, though we doubt not that if, in furtherance of the paramount and ultimate object of the reunion, it be necessary to apply some of the money in sending representatives from California to the reunion or convention, such expenditure would come within the legitimate purposes of the appropriation and the right of the state to bear.

We are now brought to the consideration of the principal point upon which the attorney-general relies to impeach the constitutional validity of the appropriation, viz.: That the act making the appropriation is inconsistent with the provisions of section 34 of article IV of the Constitution, which is above reproduced in full herein. The gravamen of the attorney-general's argument in support of this position is that the language of the act is so uncertain and indefinite that it cannot be determined therefrom whether the appropriation thereby provided for is or is not for a public purpose. This argument, no doubt, comes from the language of the act, "for the purpose of assisting to defray the expenses of a *public nature,*" etc. It may be conceded that this language is so general as to be ambiguous as to the specific purpose of the appropriation, and if the act contained no further amplification of the purpose for which the appropriation is designed than may be implied from those words—that is, that the appropriation was for some unexpressed or undiscovered purpose—it might be necessary to hold that the position of the attorney-general is well taken. But the language referred to is immediately followed by other language which clearly and with certainty expresses the specific purpose of the appropriation—a purpose which the legislature has found refers to the general welfare of the state and, therefore, the expenses necessary for its execution a burden which may properly be borne by the state.

There is no ground to support the argument that the appropriation is not for a "single" purpose within the meaning of that word as it is employed in the section of the Constitution mentioned. The sole and only purpose of the appropriation, as is clearly deducible from the language of the act, is to assist in defraying the expenses of a convention of persons who are so to meet in reunion to effectuate a purpose by the execution of which, according to the tenor of the act here in

question and the act of Congress above referred to, the public welfare of the state will be subserved.

Nor is there any legal reason which will uphold the objection that the act is invalid because it vests in the Governor discretion as to the expenditure of the money appropriated. This provision was doubtless inserted in the act for the purpose of committing to the judgment of the executive the determination of the manner in which the appropriation may be expended to the best and highest interests of the state. If, for illustration, it becomes necessary to send representatives from the state to the reunion, it is only proper that the Governor, upon whom the act fixes the responsibility for the expenditure of the money, should be clothed with some discretionary power as to the number of persons so to be sent, and as to the amount of money that should reasonably be expended for defraying the expenses of such representatives to Vicksburg and back and while there during the progress of the convention. This should be true, since the act itself does not undertake to point out specifically how the money shall be used. Of course, the presumption is that the executive will perform his duty under the act faithfully and in furtherance of the objects and purposes intended to be subserved thereby.

Our conclusion is that the appropriation is perfectly valid, and, accordingly, a writ of mandate will issue out of this court commanding and requiring the respondent, state controller, to draw his warrant or warrants on the fund appropriated by the act in favor of the Governor of the state of California, as provided by said act, and, in accordance with the stipulation heretofore filed herein by the attorneys of the respective parties, said writ is ordered to issue forthwith.

Chipman, P. J., and Burnett, J., concurred.