(No. 43028.—

PAUL E. HAMER, Appellant, *vs.* BOARD OF EDUCATION OF SCHOOL DISTRICT No. 109, Appellee.

*Opinion filed Dec. 4, 1970.—Rehearing denied Jan. 27, 1971.*

Paul E. Hamer, of Northbrook, for appellant.

Ralph Miller, Allyn J. Franke, and Norman & Billick, all of Chicago, for appellee.

Mr. Chief Justice Underwood delivered the opinion of the court:

Paul E. Hamer filed his complaint in the circuit court of Lake County for a declaratory judgment that sections 10—20.13, 10—22.25 and 34—8 of the School Code of 1961 (Ill. Rev. Stat. 1969, ch. 122, pars. 10—20.13, 10—22.25 and 34—8) are unconstitutional. The court dismissed the complaint on motion of defendant Board of Education of School District No. 109, Lake County, Illinois. Hamer appeals from that order pursuant to Rule 302.

Section 10—20.13 provides in part that the school board has the duty "to purchase, at the expense of the district, a sufficient number of textbooks for children whose parents are unable to buy them." Section 10—22.25 provides that the school board shall have the power "To purchase textbooks and rent them to the pupils." Section 34—8 provides

in part that the board of education in cities having a population exceeding 500,000 "may furnish free textbooks to pupils and may publish its own textbooks and manufacture its own apparatus, equipment and supplies."

The complaint alleges that Hamer is a resident of School District No. 109 and has four children attending schools in the district. In August 1969 he was asked to pay a textbook rental fee for each of his children attending school and told that if he had a problem making the payment, he could work out a confidential arrangement with the treasurer of the district. Although Hamer did not pay the textbook rental or make any arrangement with the district treasurer, the children were supplied with textbooks at the beginning of the 1969-1970 school year. As the school year progressed and the failure to pay the textbook rental or make the confidential arrangement with the treasurer continued, the textbooks were taken from the children. Hamer then instituted this action against the school board.

The constitutional attacks on sections 10—20.13, 10—22.25 and 34—8 and the action of the school board are numerous and involved. They concern the first amendment (right of assembly), the fourth amendment (search and seizure), and the fourteenth amendment (due process and equal protection of the laws) of the Federal constitution; sections 1 (right to privacy), 2 (due process), 6 (search and seizure, 14 (law granting special privileges), 17 (right of assembly), 19 (right to remedy and justice) and 20 (recurrence to fundamental principles) of article II; article III (distribution of powers); sections 22 (special laws prohibited) and 23 (release of public debts prohibited) of article IV; section 1 (right to free common school education) of article VIII; and sections 1, 2, 3, 9 and 10 (taxation) of article IX of the Illinois constitution. It is unnecessary to further detail these contentions because most of them simply are not properly before us.

The complaint does not allege that plaintiff cannot afford

to pay the textbook rental or purchase the textbooks. Thus, he does not bring himself within the operation of section 10—20.13 and he has not been adversely affected by it. He argues, nevertheless, that as a resident and taxpayer of the district, he has standing to challenge its constitutionality, even though he is not affected by the section except as a taxpayer. This may be true, but he did not bring the action as a taxpayer. Furthermore, the complaint does not allege that the school board has bought textbooks and loaned them to children whose parents could not buy them and consequently affected him as a taxpayer.

What we have just stated with respect to section 10—20.13, also applies to plaintiff's standing to question the constitutionality of section 34—8. Since defendant is not a city having a population exceeding 500,000, plaintiff is not affected by section 34—8 as a taxpayer or otherwise. Furthermore, his principal attack on section 34—8 is that permitting the Board of Education of the City of Chicago to issue free textbooks without a referendum, while permitting all other school districts to issue free textbooks only after being authorized by a referendum (see Ill. Rev. Stat. 1969, ch. 122, par. 28—14) constitutes special legislation in violation of section 22 of article IV of our constitution. Plaintiff has not alleged any facts showing that the legislative authority to issue free textbooks without a referendum in cities with a population of over 500,000 is based on an unreasonable classification and we have recently found this classification to be reasonable with respect to various school matters. See *Latham* v. *Board of Education,* 31 Ill.2d 178.

This brings us to the real question raised by this appeal. It is argued that charging pupils for the use of textbooks violates section 1 of article VIII of our constitution which provides: "The general assembly shall provide a thorough and efficient system of free schools, whereby all children of this state may receive a good common school education." In support of this argument plaintiff cites *Paulson* v. *Minidoka*

*County School District No. 331,* 93 Idaho 469, 463 P.2d 935, and *Bond* v. *Public Schools of the Ann Arbor School District,* 383 Mich. 693, 178 N.W.2d 484.

In *Paulson* the Minidoka County School District refused to furnish the State university a transcript of courses studied and grades achieved for one of its high school graduates because the graduate had not paid the $12.50 "textbook fees" and the $12.50 "school activity fees" while he was attending high school. Section 1 of article 9 of the 1890 Idaho constitution provides "* * * it shall be the duty of the legislature of Idaho, to establish and maintain a general, uniform and thorough system of public, free common schools." While indicating that school districts could require "reasonable deposits" from students as protection against "extraordinary wear and tear or damage to school books", the Idaho Supreme Court held that the "textbook fees" violated the free school provision of the Idaho Constitution. The reasoning of the Court was "Textbooks are necessary elements of any school's activity. They represent a fixed expense peculiar to education, the benefits from which inure to every student in equal proportion (ignoring differences in ability and motivation) solely as a function of his being a student. Unlike pencils and paper, the student has no choice in the quality or quantity of textbooks he will use if he is to earn his education. He will use exactly the books, prescribed by the school authorities, that his classmates use; and no voluntary act of his can obviate the need for books nor lessen their expense. School books are, thus, indistinguishable from other fixed educational expense items such as school building maintenance or teachers' salaries. The appellants may not charge students for items because the common schools are to be 'free as our constitution requires'." 93 Idaho 469, 463 P.2d 935, 938-939.

In *Bond* the Supreme Court of Michigan was asked to determine whether the elementary and secondary schools of that State could compel students to furnish textbooks and

supplies at their own expense when article VIII, section 2 of the 1963 Michigan constitution provides: "The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law." The Michigan court quoted and adopted the rationale of the Idaho court in holding the Michigan constitutional provision for free public elementary and secondary schools prohibited the schools from collecting fees for textbooks and school supplies. However, it seems to us significant that there were substantial changes in the educational provisions of the pre-1963 Michigan constitution as contrasted with the 1963 constitutional provisions above quoted. The earlier provisions had required only that "The legislature shall continue a system of primary schools, whereby every school district in the state shall provide for the education of its pupils *without charge for tuition*." (Emphasis added.)

This court expressed a contrary opinion in *Segar* v. *Board of Education of the School District of the City of Rockford,* 317 Ill. 418. In that case the voters of the school district had approved a proposition to issue free textbooks pursuant to the Free Text-book Act. (Laws of 1919, p. 915.) The board of education passed a resolution requiring a deposit from the students which was to be refunded if the books were returned in "reasonably good condition." A *mandamus* action was brought against the board to compel the issuance of the textbooks without requiring the deposit. In rejecting the contention that the book deposit violated section 1 of article VIII, this court stated: "While they [plaintiffs] do not point out in what respect this section of the constitution is transgressed, we assume it is their position that provision for a system of free schools is not made until text-books are provided at public expense for the use of pupils attending the public schools. No authority is cited in support of such a contention, and we are of the opinion that none can be found. The authorities seem to be uniform that a board of education has no power to furnish text-

books to the pupils at public expense without specific authority so to do. (Annotations, 17 A.L.R. 299; 45 L.R.A.—N.S.—972.) A system of schools which permits all persons of school age residing in the district to attend classes and receive instruction in the subjects taught, without a tuition charge, provides free schools, and the fact that the parents of pupils financially able to do so are required to provide their children with text-books, writing materials and other supplies required for the personal use of such pupils does not change the character of the school." 317 Ill. 418, 421.

The statement in *Segar* that there was no authority for the contention that a constitutional provision for "free schools" means that textbooks must be furnished to all students free of charge appears to have been an accurate statement in 1925 when the decision was rendered. The Idaho decision to the contrary was decided in 1970 without any citation of authority and the Michigan decision, also to the contrary, was also decided in 1970 with only the Idaho decision cited as authority.

In determining the intention and purpose of a constitutional provision, this court will look to the natural and popular meaning of the language used as it was understood at the time the constitution was adopted. *American Aberdeen-Angus Breeders' Association* v. *Fullerton*, 325 Ill. 323, 328.

The constitutional convention in August of 1818 passed an ordinance (Laws of 1819, App., p. 21) accepting the Enabling Act of Congress (3 U.S. St. at Large, 428) which made provision for setting aside certain land for school use and granted to the State a percentage of the proceeds from the sale of land for the encouragement of learning, but the constitution of 1818 contained no provision concerning education. The first authorization for the levying of a tax of any kind for the support of a public school occurred when the second General Assembly granted a petition by the inhabitants of the Town of Alton. (Laws of 1821, p. 39.) The next General Assembly repealed the section of the act authorizing

the taxing of town lots for public education. Laws of 1823, p. 147.

The first effort to establish a system of free schools in the State was made by the fourth General Assembly when it passed "An Act providing for the establishment of free schools," approved January 15, 1825. (Laws of 1825, p. 121.) Reaction to this law was immediate and the next General Assembly amended it to provide that "No person shall hereafter be taxed for the support of any free school in this State unless by his own free will and consent first had and obtained in writing." (Laws of 1827, p. 259.) The real strength of the reactionary movement to free public schools can be appreciated, however, by an examination of the school law of 1841. (Laws of 1841, p. 259.) That law with its 109 sections completely omits any provision for local taxation.

The constitution of 1848, like the constitution of 1818, did nothing to further the cause for a system of free common schools and the advocates of the free school movement had to wait another 7 years before their efforts produced the Free School Law of 1855. (Laws of 1855, p. 51.) A much more detailed acount of the free school movement and its leaders can be found in Cook, *Educational History of Illinois* (1911) and Moses, *Illinois Historical and Statistical* (1892) pp. 988-1012. It is sufficient for our purposes to note that the concept of a free common school did not enjoy the broad popular support it does now and that if it included anything more than furnishing a schoolhouse and teachers at public expense, it was not the furnishing of textbooks to the students.

At the time of the constitutional convention in 1870, the only provision of the school law concerning textbooks was that the school directors could direct "what text-books shall be used in their respective schools." (Laws of 1865, p. 119, sec. 18.) Dr. Newton Bateman, the Superintendent of Public Instruction from 1859 to 1875 (except for a two-year per-

iod from January 1863 to January 1865), is the recognized authority on school affairs during the period of time with which we are dealing. (See Cook, *Educational History of Illinois*, p. 114-140.) Dr. Bateman in the 1871 edition of his book, *School Laws and Common School Decisions of the State of Illinois*, at pages 86-87, comments on this provision of the law of 1865, which was still in effect at the time his book was published, and states: "Uniformity of text-books, in the schools of a district, is absolutely indispensable. Different books in the same branch of study should in no case be allowed. * * * In selecting text-books, directors will, of course, avail themselves of, and be largely governed by, the superior judgment and experience of the teacher. But uniformity must be insisted upon, and, when the best practical selections are made, they should not be changed for light reasons. Frequent change of text-books is a serious expense and a source of much annoyance and irritation to parents and should be avoided."

The purpose of section 1 of article VIII was to compel the General Assembly to retain and perpetuate, as a minimum, the system of free schools that had already been developed. (Debates of Constitutional Convention 1869-70, pp. 1733 and 1734.) Since section 1 contemplated retention and perpetuation of the existing free public school system which required students to furnish their own textbooks, there was no discussion of textbooks when section 1 was being considered. When section 4 of article VIII (a conflict of interest provision which prohibits school officers from being interested in school contracts) was being considered, however, there was considerable discussion of textbooks. During the debate, Delegate William H. Underwood stated: "Now sir, it is a notorious complaint that agents for books and school apparatus go around and get the teachers and school directors to introduce their books and school apparatus into the schools, giving them a commission. The teacher or school directors' duty is to get the very best books

and apparatus possible. * * * Parents have been compelled to purchase books unnecessarily, and sometimes worthless books, at great expense." Debates of Constitutional Convention 1869-70, p. 1748.

Following the adoption and ratification of the constitution of 1870, the General Assembly passed "An Act to establish and maintain a system of free schools" (Laws of 1871-2, p. 700) which was a complete code and repealed all former acts respecting schools. (*Powell* v. *Board of Education*, 97 Ill. 375.) Section 48 of the new act gave school directors authority to direct "what text-books and apparatus shall be used in the several schools"—the same power they had prior to the constitution of 1870 (Laws of 1865, p. 119, sec. 18)—and heeding the advice of Dr. Bateman on uniformity and avoiding frequent changes, also provided that the directors shall "strictly enforce uniformity of text-books therein, but shall not permit text-books to be changed oftener than once in four years." In construing the new provision this court stated: "The reason for prohibiting the change of textbooks oftener than once in four years undoubtedly was to save expense to parents of small means." (*People ex rel. Mack* v. *Board of Education of Aurora*, 175 Ill. 9, 17.) The act of 1872, of course, made no provision for furnishing textbooks to students at public expense.

Our examination of the contemporary statutes, writings and well-known practices convinces us that the popular and natural meaning of the term "free schools" at the time the constitution was adopted by the constitutional convention and ratified by the voters did not include furnishing textbooks to the students at public expense. Nor does the fact that the Idaho court found textbooks to be "necessary elements of any school's activity" and the Michigan court found them to be an "integral fundamental part of the elementary and secondary education" alter our conclusion. Textbooks were just as "necessary" and "integral" in 1870

as they are in 1970. Dr. John A. Nietz in *Old Textbooks* (1961), p. 1, discusses the textbooks used in the common schools from colonial days to 1900 and observes: "An analysis of the school textbooks used in the past reveals a truer history of what was taught in the earliest schools than does a study of past educational theories alone. This is particularly true for the early American schools. The teachers in the early days of our country were so meagerly trained and educated that they depended strongly on the textbooks for what to teach and how to teach. Most authorities agree that in the United States the old textbooks in use in any particular school largely constituted the school's course of study."

We hold that section 1 of article VIII of our constitution does not prohibit the legislature from authorizing school boards to purchase textbooks and rent them to pupils. It does, of course, have the power to direct school boards to issue textbooks to students free of charge, but our constitution does not require it.

As we have previously indicated, the plaintiff has advanced numerous constitutional attacks against several sections of the School Code of 1961 and the action of the defendant school board. He has also asserted several statutory violations by the school board and an erroneous ruling by the trial court. To repeat all these arguments and answer them would unduly prolong this opinion. We have dealt at length with the only substantial question presented. A sufficient answer to the other contentions is that the legislature has the power to authorize defendant to charge a book rental fee and did so, the voters of defendant district did not exercise their statutory right to have defendant issue textbooks at public expense, defendant school board established a book rental fee, and it is not alleged that the fee is unreasonable or that plaintiff cannot pay the fee. We are of the opinion, therefore, that the trial court properly dismissed the complaint.

The judgment of the circuit court of Lake County is accordingly affirmed.

*Judgment affirmed.*