467 S.E.2d 150

**RANDOLPH COUNTY BOARD OF EDUCATION, Plaintiff Below, Appellant,**

v.

**Chris ADAMS, et al., Defendants Below, Appellees.**

No. 22902.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 26, 1995.

Decided Dec. 14, 1995.

Harry M. Rubenstein, Kay, Casto, Chaney, Love & Wise, Morgantown, John O. Kizer, Kay, Casto, Chaney, Love & Wise, Charleston, David W. Hart, Prosecuting Attorney, Elkins, for Appellant.

Earl W. Maxwell, Elkins, for Appellees.

CLECKLEY, Justice:

The plaintiff below and appellant herein, Randolph County Board of Education (Board), appeals from an order of the Circuit Court of Randolph County, which held in a declaratory judgment action that it was un-

constitutional for the Board to charge parents of non-needy school children a book user fee for school books and materials necessary for the completion of the "required school curriculum."

## I.

### FACTS AND PROCEDURAL HISTORY

On July 26, 1993, the Board, after losing a levy at the polls, established a book user fee for non-needy school children. The Board asserts that the "driving force" behind the fee system was the serious financial difficulties of the school system. According to the Board, its deficit at the end of the 1993–94 school year was $490,000. The deficit purportedly grew to $800,000 at the end of the 1994–95 school year.[1] The parents of kindergarten children were charged $30.00, parents of first through sixth graders were charged $60.00, and parents of junior and senior high school students were charged $80.00. The Board based the fee system on a recommendation from the Textbook Funding Committee which obtained information from various school systems.

The Board reduced the book user fee by one-half for the 1994–95 school year so parents of kindergarten children paid $15.00, first through sixth graders paid $30.00, and junior and senior high school students paid $40.00. The decision to reduce the fee was based, in part, on the fact that no new textbooks were adopted for the 1994–95 school year.

According to the defendants below and appellees herein,[2] the Board's book user fee essentially amounted to tuition because the fee was mandatory on a non-needy basis regardless of what type of books and materials was given to the child and regardless of whether the parents purchased textbooks through private vendors. The Board claims, and there is no evidence to the contrary, that no student was deprived of a textbook or restricted from school based on nonpayment

of the book user fee. The Board created a standard for classifying students by economic need by relying on a list of children actually receiving reduced cost or free meals through a school lunch program. The book user fee was ultimately imposed only upon the 40 percent of students deemed non-needy (60 percent of the students in the Randolph County School system were participating in the free or reduced school lunch program). However, parents whose children qualified for free or reduced meals but chose not to participate were charged the book user fee. No procedure was established to separate children who may have been needy and qualified under other need based programs and either chose not to apply or simply failed to apply for assistance. According to the defendants, the book user fee was specifically designed to equal the amount needed for the deficit in purchasing books.[3]

On June 7, 1994, the Board filed a petition for declaratory judgment directing over one hundred parties (single parents and married couples who were parents of school children) to pay the book user fee. In response, the defendants filed a Motion to Dismiss pursuant to Rule 12(b) of the West Virginia Rules of Civil Procedure. The defendants asserted the book user fee was unconstitutional and the Board's establishment of the fee was *ultra vires*.

The circuit court held hearings on August 22, September 1, and October 24, 1994. On December 13, 1994, the circuit court ruled the book user fee was unconstitutional and dismissed the Board's suit. The circuit court held: "[I]t is unconstitutional for the Randolph County Board of Education to charge for textbooks and materials necessary for the completion of the required school curriculum and those textbooks and materials necessary for completion of the required school curriculum must be provided free of charge."

The Board then sought a stay from the circuit court's order pending the outcome of

---

1. There is some dispute over the actual cause and amount of the Board's deficit.

2. The defendants below and appellees herein are several of the parents of school-age children who attend the Randolph County public schools and

who have failed to pay the book user fee for their respective children.

3. The book purchasing deficit was approximately $130,000 according to the defendants.

this appeal. The circuit court denied the Board's motion for stay, but granted the Board a period of thirty days to seek a stay from this Court. We granted the Board's stay pending this appeal.[4] The Board now appeals the circuit court's order claiming that not only is the book user fee constitutional, but that judicial precedent and statutory authority grant the Board the right to charge such textbook user fees for non-needy school children.

## II.

## DISCUSSION

In this appeal, we are asked to clarify, if not define, what is meant in the West Virginia Constitution by "free schools." This case is our second encounter with the "free schools" language in Section 1 of Article XII of the West Virginia Constitution. In *Vandevender v. Cassell*, 158 W.Va. 87, 208 S.E.2d 436 (1974), we left unresolved the very question presented in this appeal. Thus, the specific question before us today is unanswered by binding precedent of this Court. The textbook user fee system at issue was adopted by the Board in response to an unfortunate reality: the rejection of a school levy by the citizens of Randolph County that, if passed, would have avoided the necessity for the adoption of such a fee. Nevertheless, we now determine that the "free schools" clause prevents local school authorities from charging students and their parents a fee for the use of necessary textbooks. In voiding the fee under the West Virginia Constitution, we attempt to avoid engrafting upon this constitutional provision a judicial gloss so protean, elusive, or arbitrary as to prevent the political branches from performing their mandatory constitutional function of providing "for a thorough and efficient system of free schools." Our cautious approach in construing Section 1, therefore, is intended not to excessively encroach on the powers which the Constitution has reserved for the Legislature.

4. The defendants claim the Board continued to collect fees before filing an appeal to this Court

### A.

### Standard of Review

This appeal arises from the circuit court's granting of a pretrial motion to dismiss in a declaratory judgment action. Accordingly, our review of the issue arising from this dismissal is plenary. As we recently noted in Syllabus Point 3 of *Cox v. Amick*, 195 W.Va. 608, 466 S.E.2d 459 (1995):

"A circuit court's entry of a declaratory judgment is reviewed *de novo*."

Similarly, in Syllabus Point 2 of *State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.*, 194 W.Va. 770, 461 S.E.2d 516 (1995), we stated:

"Appellate review of a circuit court's order granting a motion to dismiss a complaint is *de novo*."

Most importantly, the issue presented in this appeal is a matter of construction of our Constitution and mandates *de novo* review by this Court.

### B.

### Analysis

The "free schools" clause contained in Section 1 of Article XII of the West Virginia Constitution provides: "The Legislature shall provide, by general law, for a thorough and efficient system of free schools." Its central mandate is to require equal and quality educational opportunities for all West Virginians. Though the application of this imperative raises difficult choices and questions, the framers of our Constitution enacted Section 1 to facilitate public access to education. Premised on the belief that an educated electorate is vital to the proper operation of a democracy, Section 1 is intended to create an expedient for achieving this end while at the same time making the Legislature responsible for raising funds for that purpose. We, therefore, proceed to the basic interpretive question aware that we are interpreting a constitutional provision that seeks broadly to overcome all hostility to quality public edu-

on April 5, 1995.

cation. The framers of our Constitution lived among the ruins of a system that virtually ignored public education and its significance to a free people.[5] As Professor Bastress explained:

> "Virginia's failure to provide a system of free public education had long rankled the western counties, and when the convention met in 1861 to create West Virginia's first constitution, the framers gave high priority to public education (1863 Const. Art. X). The 1872 convention delegates, for all their conservative leanings, actually strengthened the education article. 'Article XII ... and Article X, § 5 ... give a constitutionally preferred status to public education in this State.'" Robert M. Bastress, *The West Virginia Constitution—A Reference Guide* 271 (1995), *quoting West Va. Educ. Ass'n v. Legislature*, 179 W.Va. 381, 382, 369 S.E.2d 454, 455 (1988).

■ Section 1 of Article XII of the West Virginia Constitution creates a strong presumption in favor of making everything that is deemed a necessary component to public education cost-free. When a board of education seeks to charge parents for their children's participation in public education, the board bears a heavy burden in rebutting this constitutionally based presumption. To provide otherwise would render the constitutional guarantee of a free public education an empty and cruel illusion.

■ With this background we turn to the central issue in this case: Whether a county board of education may charge a book user fee to non-needy school children. The Board points to various statutes, case law, the West Virginia Constitution, and its financial problems to justify charging the book

user fee to non-needy students. The defendants argue, on the other hand, that the book user fee is unconstitutional and *ultra vires*.[6] More specifically, the parties focus on whether the phrase "free school" includes the distribution of textbooks to all students without charge.[7]

The Board recognizes that the Legislature has an obligation to provide for a "thorough and efficient system of free schools[,]" nevertheless, it argues that the West Virginia Constitution has never been interpreted to require county boards of education to provide free books and materials to all students enrolled in their respective school districts.

■ The starting point in every case involving construction of our Constitution is the language of the constitutional provision at issue—W.Va. Const. art. XII, § 1. *See State ex rel. Mountaineer Park, Inc. v. Polan*, 190 W.Va. 276, 283, 438 S.E.2d 308, 315 (1993) (noting "[a]s in every case involving the application or interpretation of a constitutional provision, analysis must begin with the language of the constitutional provision itself").

■ In Syllabus Points 1 and 2 of *Jarrett Printing Co. v. Riley*, 188 W.Va. 393, 424 S.E.2d 738 (1992), we set forth an analysis for interpreting constitutional provisions:

> "1. 'Where a provision of a constitution is clear in its terms and of plain interpretation to any ordinary and reasonable mind, it should be applied and not construed.' Syl. Pt. 3, *State ex rel. Smith v. Gore*, 150 W.Va. 71, 143 S.E.2d 791 (1965). [*See also* Syllabus Point 1, *State ex rel. Maloney v. McCartney*, 159 W.Va. 513, 223 S.E.2d 607 (1976).]

---

5. In stating that "[t]he *Legislature shall provide, by general law,* for a thorough and efficient *system of free schools,*" the framers sought to avoid children growing up staring at unscalable walls built by decades of underfunded schools. (Emphasis added).

6. The defendants also assert the book user fee violates equal protection principles. However, we find it is not necessary to address equal protection in the context of this opinion.

7. Typically, when analyzing a rule of the State Board of Education, we usually will defer to the

State Board's authority because of its constitutional grant of authority to supervise the State's educational system. Although county boards of education are granted authority by statute and not by the Constitution, in places where there is no conflict between a county board of education and the State Board of Education, rules or regulations of a county board of education are accorded respect provided that neither statutes nor the Constitution has been violated. In this case, we find the book user fee requirement violates constitutional guarantees. Thus, the Board's rule is not entitled to deference.

"2. 'Courts are not concerned with the wisdom or expediences of constitutional provisions, and the duty of the judiciary is merely to carry out the provisions of the plain language stated in the constitution.' Syl.Pt. 3, *State ex rel. Casey v. Pauley,* 158 W.Va. 298, 210 S.E.2d 649 (1975)." (Bracketed language added).

At first glance, the "free schools" language of Section 1 of Article XII seems clear and unambiguous.[8] However, the word "free" can be a word of many meanings and its construction is often influenced by its context. When used as an adjective, the word takes on many different connotations.[9] Because the word "free" is open to divergent interpretations, we must examine the word in the context of this constitutional provision. Without doubt, the drafters of the Constitution intended to create a system of free public schools. We must now determine what comprises a free school system.

"Our basic law makes education's funding second in priority only to payment of the State debt, and ahead of every other State function. Our Constitution manifests, throughout, the people's clear mandate to the Legislature, that public education is a *prime* function of our State government. [Therefore, w]e must not allow that command to be unheeded." *Pauley v. Kelly,* 162 W.Va. 672, 719, 255 S.E.2d 859, 884 (1979). (Emphasis in original).

*See also Detch v. Board of Educ. of County of Greenbrier,* 145 W.Va. 722, 117 S.E.2d 138 (1960).

In Syllabus Point 1 of *State ex rel. Board of Education for County of Grant v. Manchin,* 179 W.Va. 235, 366 S.E.2d 743 (1988), we stated:

" 'The mandatory requirements of "a thorough and efficient system of free schools" found in Article XII, Section 1 of the West Virginia Constitution, make education a fundamental, constitutional right in this State.' Syl. pt. 3, *Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859 (1979)."

Moreover, "[t]he Thorough and Efficient Clause . . . requires the Legislature to develop a high quality State-wide education system." Syllabus Point 5, in part, *Pauley v. Kelly, supra.* We have defined a "thorough and efficient" system of schools as one which " 'develops, as best the state of education allows, the minds, bodies and social morality of its charges to prepare them for useful and happy occupations, recreation and citizenship, and does so economically.' " *State ex rel. Board of Educ. v. Manchin,* 179 W.Va. at 240, 366 S.E.2d at 748, *quoting Pauley v. Kelly,* 162 W.Va. at 705, 255 S.E.2d at 877.

Again, in *West Virginia Education Association v. Legislature,* 179 W.Va. at 382, 369 S.E.2d at 455, we stressed the importance of the connection between the West Virginia Constitution and education when we stated: " '[T]he West Virginia Constitution give[s] a constitutionally preferred status to public education in this State. . . . Indeed, in this commonwealth, education is an essential constitutional priority.' " (Citations and some text omitted). *See also State ex rel. Board of Educ., County of Kanawha v. Rockefeller,*

---

**8.** Clear and unambiguous language is itself the best expression of the framer's intent. *See State ex rel. Brotherton v. Blankenship,* 157 W.Va. 100, 207 S.E.2d 421 (1973). However, if the language of the constitutional provision is ambiguous, then the "ordinary principles employed in statutory construction must be applied to ascertain such intent." *State ex rel. Brotherton v. Blankenship,* 157 W.Va. at 108, 207 S.E.2d at 427. *See also Diamond v. Parkersburg–Aetna Corp.,* 146 W.Va. 543, 122 S.E.2d 436 (1961) (noting that ambiguous constitutional provisions are subject to the same principles of construction as any other written document). Although this Court "is empowered to construe, interpret and apply provisions of the Constitution, . . . [we] may not add to, distort or ignore the plain mandates thereof." *State ex rel. Bagley v. Blanken-*

ship, 161 W.Va. 630, 643, 246 S.E.2d 99, 107 (1978). Although the " 'cardinal rule of construction[,]' " is to give effect to the intent of the framers of the Constitution, it is appropriate to consider " 'new and changing conditions not existing at the time the Constitution was adopted' " when interpreting and applying constitutional provisions. Syllabus Point 4, in part, *State ex rel. Smith v. Kelly,* 149 W.Va. 381, 141 S.E.2d 142 (1965). (Citation omitted).

**9.** See *The Random House Dictionary of the English Language* at 763 (Second Edition, Unabridged 1987) definition of the word "free" listing forty-one different definitions when used as an adjective, three definitions when used as an adverb, and five when used as a verb.

167 W.Va. 72, 281 S.E.2d 131 (1981); *State ex rel. W. Va. Bd. of Educ. v. Gainer,* 192 W.Va. 417, 452 S.E.2d 733 (1994); *West Va. Bd. of Educ. v. Hechler,* 180 W.Va. 451, 376 S.E.2d 839 (1988).

Moreover, we recognize that in relation to education in this State, Section 1 of Article XII

" 'adequately reflects the will of the people, through the basic law enacted by them, that a thorough and efficient system of free schools is of paramount importance in a free society and that neither the Legislature nor the executive branch of government may perform any act which would result in the elimination of this safeguard.' " *Pauley v. Bailey,* 174 W.Va. 167, 174, 324 S.E.2d 128, 134–35, *quoting State ex rel. Brotherton v. Blankenship,* 157 W.Va. at 125, 207 S.E.2d at 436.

▆▆▆▆ In light of this background, it is clear that the Constitution provides a clear entitlement to a basic education. Although we have never interpreted the "free schools" portion of Section 1 of Article XII, we have considered what the "thorough and efficient" portion of this section and article means in relation to a school system.[10] We define a "thorough and efficient" system of schools as: "It develops, as best the state of education expertise allows, the minds, bodies and social morality of its charges to prepare them for useful and happy occupations, recreation and citizenship, and does so economically." *Pauley v. Kelly,* 162 W.Va. at 705, 255 S.E.2d at

877. Moreover, this definition is comprised of a myriad of factors. For instance:

"[l]egally recognized elements in this definition are development in every child to his or her capacity of (1) literacy; (2) ability to add, subtract, multiply and divide numbers; (3) knowledge of government to the extent that the child will be equipped as a citizen to make informed choices among persons and issues that affect his own governance; (4) self-knowledge and knowledge of his or her total environment to allow the child to intelligently choose life work—to know his or her options; (5) work-training and advanced academic training as the child may intelligently choose; (6) recreational pursuits; (7) interests in all creative arts, such as music, theatre, literature, and the visual arts; (8) social ethics, both behavioral and abstract, to facilitate compatibility with others in this society." *Pauley v. Kelly,* 162 W.Va. at 705–06, 255 S.E.2d at 877.

We acknowledge that education is defined as " '1. [T]he act or process of imparting or acquiring general knowledge, developing the powers of reasoning and judgment, and generally of preparing oneself or others intellectually for mature life. 2. [T]he act or process of imparting or acquiring particular knowledge or skills, as for a trade or profession.' " *Pauley v. Kelly,* 162 W.Va. at 704, 255 S.E.2d at 876, *quoting The Random House Dictionary,* Unabridged Edition (1973). We recognize that part of the goal of the school system is to instruct students so they might become well-rounded, academically talented,

10. The Board asserts that we have already construed the meaning of "free schools" in *Vandevender v. Cassell, supra.* Under the Board's theory, this Court's decision that school boards must provide free books and materials to needy students gives at least tacit approval of a book user fee for non-needy students.

We disagree with the Board's analysis. First of all, the Board misconstrues the reach and scope of the *Vandevender* decision. In *Vandevender,* we found textbooks and materials must be supplied to needy students. The Board's basic argument is that our failure to specifically require textbooks and materials be supplied to all students indicates this Court's approval of charging fees to some students. The issue before this Court in *Vandevender* was limited to the rights of needy children. This Court did not address whether it would be unconstitutional to impose such a fee on parents who could afford to pay. The Board in this case focuses on what we did not say in *Vandevender* while ignoring the vast body of case law in this jurisdiction that not only emphasizes the fact that education is important, but is a fundamental right in this jurisdiction. The case *sub judice* is merely an extension of our opinion in *Vandevender, supra.* In *Vandevender v. Cassell,* 158 W.Va. at 92, 208 S.E.2d at 439, we indicated: "Under a ' "free" ' school system fees cannot be charged as a requirement for students to be admitted to school nor can fees be charged for any required course under the curriculum set up by the state board of education." In this case, we merely expand our understanding of a free school system to prohibit charging fees for any items that are a fundamental part of making that school system work.

and productive citizens.[11] How one goes about this task and what materials are used are key. For this reason, we find that whatever items are deemed *necessary* to accomplish the goals of a school system and are in fact an " 'integral fundamental part of the elementary and secondary education' " must be provided free of charge to all students in order to comply with the constitutional mandate of a "free school" system. *Bond v. Public Schools of Ann Arbor School District,* 383 Mich. 693, 702, 178 N.W.2d 484, 488 (1970). (Citation omitted).

Of course, this is not a precise formulation, and in the nature of things it cannot be. The criterion is necessarily one of degrees and must be so defined. But we think it points the way to a correct decision in this case. This will not satisfy those who seek mathematical or rigid formulas, but such formulas are not provided by the great concepts of the Constitution. *See generally Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). Creating the above test ensures a "degree of flexibility[.]" *Granger v. Cascade County School District,* 159 Mont. 516, 528, 499 P.2d 780, 786 (1972). School boards may maintain their right to control the school system, while students need not fear that a fee will be charged for exercising their basic rights to an education.

Are the textbooks and materials at issue in this case such an " 'integral fundamental part of the elementary and secondary education' " that they must be provided free? We find the answer to this question is "yes." Of course, providing a place of instruction and qualified teachers are extremely important; however, hindering access to necessary materials would make the educational process nearly meaningless. *See Bond v. Public Schools of Ann Arbor School District,* 383 Mich. at 701–02, 178 N.W.2d at 488, *quoting Crowley v. Bressler,* 181 Misc. 59, 64, 41 N.Y.S.2d 441, 445–46 (1943) ("[n]o education of any value is possible without school books").

In 1954, the United States Supreme Court spoke of denying the opportunity of an education in the context of denying equal access to education. Today, this Court examines how charging a fee for something so fundamental as a textbook can also amount to a denial of an opportunity for an education. Even now the words of Chief Justice Warren in the landmark case of *Brown v. Board of*

---

11. In 126 C.S.R. § 11–3 (1989), the State Board of Education provides a lengthy description of its goals for the West Virginia school system:

"3.1. Description and Goal.—A thorough and efficient system of education requires equality of substantive educational offerings and access to related services for all children and does so without waste. Providing such an educational system is a goal toward which the West Virginia Legislature, the West Virginia Board of Education, the West Virginia Department of Education, and county boards of education shall strive. A thorough and efficient system of education produces students competent in functional skills which enable them to become active citizens, productive employees, and successful in subsequent educational experiences.

"3.2 Knowledge, Skills, and Attitudes.— Specifically, a thorough and efficient system of education shall develop in students an appreciation of their opportunity and responsibility for acquiring knowledge, skills, and attitudes required for:

"3.2.1. Developing effective written and oral communication, reading, and mathematical computation, and problem solving;

"3.2.2. Retrieving, receiving, and utilizing information for the benefit of the individual and society;

"3.2.3. Understanding world geography; government, social and economic systems and their development;

"3.2.4. Developing positive self-esteem;

"3.2.5. Applying science and technology in rational decision making, and creative problem solving to function successfully in a high technological society;

"3.2.6. Promoting health, safety, physical fitness, and recreation necessary for an active mind and body;

"3.2.7. Understanding of and participating in the creative, visual, and performing arts to enrich the quality of their lives;

"3.2.8. Understanding their culture and heritage;

"3.2.9. Functioning successfully in advanced academic and technical training programs and useful occupations;

"3.2.10. Developing basic values and ethical principles and applying them to life; and

"3.2.11. Developing the desire and skills to continue life-long learning.

"County comprehensive educational programs which implement the above knowledge, skills, and attitudes will provide: (1) high-quality educational programs and access to related services for all students, and (2) the opportunities for all students to achieve specified learning outcomes in each program of study."

*Education,* 347 U.S. 483, 492–93, 74 S.Ct. 686, 691, 98 L.Ed. 873, 880 (1954), still ring true:

> "In approaching this problem, we cannot turn the clock back.... We must consider public education in the light of its full development and its present place in ... life [in West Virginia].
>
> \* \* \* \* \* \*
>
> "Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities.... It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms."

Throughout the history of this State, we have taken great strides to ensure that each child has an equal opportunity to receive a quality education. *See generally* Charles H. Ambler, *A History of Education In West Virginia* (1951). Specifically, textbooks have always been an important issue in the great educational debate. Moreover, there generally has been a "push" to equalize education and providing "free textbooks followed as a matter of course." Charles H. Ambler, *supra* at 664.

Various legislative enactments [12] and case law have solidified the concept that free textbooks are a fundamental part of the learning experience. Even in the general authorization of power to the State Board of Education, the Legislature indicated that the supervision over the distribution of free textbooks was one of the duties of the State Board.[13] As we noted previously in *Vandevender, supra,* we found the issue of textbooks so important that the failure to provide free textbooks to needy school children abridged a fundamental constitutional right. Although we were considering a different

---

12. *See* W.Va.Code, 18–5–21 (1941); W.Va.Code, 18–5–21a (1941); W.Va.Code, 18–5–21b (1941). W.Va.Code, 18–5–21, provides:

> "The board of education of every county may purchase the necessary textbooks to be used in the free schools by the pupils thereof. All textbooks so purchased shall be kept in charge by the county superintendent and furnished to the pupils of the free schools of the county as hereinafter provided. All such books shall be furnished by the county board as prescribed by law, and purchased at the net wholesale price.
>
> "In such case, at the commencement of every term, the county superintendent shall deliver to the teachers of the various schools the textbooks necessary for the use of the several pupils enrolled therein for the ensuing term of school and shall take from them receipts showing the number and kind of textbooks so received. It shall be the duty of the teachers to take charge of such textbooks and to distribute them among the pupils of their schools as needed; and said teachers shall have and exercise general control of all such textbooks, and at the close of the school term, and before receiving an order for salary for the last month of such term, shall collect and gather together all textbooks so used and deliver them to the county superintendent."

W.Va.Code, 18–5–21a, states: "The board of education of every county shall provide the textbooks to be used in the free schools for the pupils whose parents, in the judgment of the board, are unable to provide the same; such textbooks shall be those adopted by the state board of education." W.Va.Code, 18–5–21b, states: "The board of education of every county, upon application of the proper authorities of any private school, may likewise provide state-adopted textbooks for the use of the pupils enrolled therein whose parents, in the judgment of the board, are unable to provide same."

13. W.Va.Code, 18–2–5 (1990), notes the powers of the State Board of Education include supervising the county boards of education. W.Va.Code, 18–2–5, provides, in relevant part:

> "Subject to and in conformity with the constitution and laws of this state, the state board of education shall exercise general supervision of the public schools of the state, and shall make rules in accordance with the provisions of article three-b [§ 29A–3B–1 et seq.], chapter twenty-nine-a of this code for carrying into effect the laws and policies of the state relating to education, including rules relating to ... *the distribution and care of free textbooks by the county boards of education*[.]" (Emphasis added).

issue, in *Pauley v. Kelly,* 162 W.Va. at 706, 255 S.E.2d at 877, we observed the necessary ingredients to a quality education: "Implicit are supportive services ... [like] good physical facilities, *instructional materials* and personnel[.]" (Emphasis added).

 Other jurisdictions also have concluded that charging for textbooks violates a student's right to a free school system. We find the holdings of these jurisdictions persuasive. In *Paulson v. Minidoka County School District No. 331,* 93 Idaho 469, 472, 463 P.2d 935, 938–39 (1970), the Supreme Court of Idaho found:

> "Textbooks are necessary elements of any school's activity. They represent a fixed expense peculiar to education, the benefits from which inure to every student in equal proportion (ignoring differences in ability and motivation) solely as a function of his being a student. Unlike pencils and paper, the student has no choice in the quality or quantity of textbooks he will use if he is to earn his education. He will use exactly the books, prescribed by the school authorities, that his classmates use; and no voluntary act of his can obviate the need for books nor lessen their expense.... School books are, thus, indistinguishable from other fixed educational expense[s.]"

Similarly, the Michigan Supreme Court in *Bond v. Public Schools of Ann Arbor School District,* 383 Mich. at 702, 178 N.W.2d at 488, also held "it is clear that books and school supplies are an essential part of a system of free public elementary and secondary schools." *See also Granger v. Cascade County School Dist., supra.* These cases all find that books are necessary elements interwoven into the school system. The findings of these courts acknowledge that denying access to suitable educational materials is

like denying the right to attend school itself. These courts find, as we do now, that free does not just mean tuition-free but also includes a right to educational materials that are basic to a quality education. Thus, by finding that textbooks fit within the definition of a free school system, these courts embrace the language and the spirit of their constitutional provisions.

Of course, all jurisdictions are not in agreement with *Paulson, Bond,* and *Granger.* The Board points to other cases supporting its contention that charging for books is permissible.[14] Constitutional history, prior case law, statutes, and/or state constitutions support the following jurisdictions' contentions that free merely means without tuition. *See Sneed v. Greensboro City Bd. of Educ.,* 299 N.C. 609, 264 S.E.2d 106 (1980) (constitutional history suggests free equals no tuition); *Chandler v. South Bend Community School Corp.,* 160 Ind.App. 592, 312 N.E.2d 915 (1974) (constitutional history suggests free equals no tuition); *Board of Educ. v. Sinclair,* 65 Wis.2d 179, 222 N.W.2d 143 (1974) (constitution states no tuition); *Hamer v. Board of Educ. of School Dist. No. 109,* 47 Ill.2d 480, 265 N.E.2d 616 (1970) (history and case law indicate free textbooks were not framer's intent).[15] These jurisdictions focused on the fact that free books were not provided in the past. Moreover, they uniformly suggested refusing to provide text books and materials to non-needy students did not alter the constitutional mandate of a free school system. We have a different historical background. Thus, we do not agree that refusing required text books and materials " 'does not change the character of the school.'" *Hamer v. Board of Educ. of School Dist. No. 109,* 47 Ill.2d at 486, 265 N.E.2d at 620, *quoting Segar v. Board of*

---

**14.** In its brief, the Board asserts the circuit court improperly relied upon *Paulson, Bond,* and *Granger* and ignored the jurisdictions finding book fees were permissible. It must be remembered, however, that it is not the quantity of supporting case law but the quality of the decisions and the similarity of the facts and issues involved that dictate whether to adopt the persuasive authority of other jurisdictions.

**15.** The Board also cites *Beck v. Board of Education of Harlem Consolidated School District No.*

*122,* 63 Ill.2d 10, 344 N.E.2d 440 (1976), to support its contention. First, *Beck* did not consider the constitutionality of providing textbooks. Moreover, the opinion notes that Illinois had a statute requiring textbooks to be provided free of charge to students. The *Beck* court only determined whether workbooks and other educational materials fit within the definition of textbook. Therefore, *Beck* actually seems to support the defendants' contentions.

*Educ. of School Dist. of City of Rockford,* 317 Ill. 418, 421, 148 N.E. 289, 290 (1925). Our Constitution is written in terms general enough to accommodate the inevitable differences that arise in each generation. Over time the various school systems have been forced to become more responsive to technological innovations while at the same time the idea of a free public school system has become firmly ingrained in our society. Thus, considering the flexible nature of the West Virginia Constitution, we find it difficult to believe and, more significantly, refuse to hold that Section 1 of Article XII should be so narrowly construed.

 The education of today's youth is an important task that is not to be lightly undertaken. Strangling constitutional mandates in favor of budgetary constraints accords neither with the spirit nor the letter of the West Virginia Constitution. If textbooks are truly of paramount importance, a fact which no one here seems to dispute, and moreover are a fundamental part of a free school system, then there is no other choice for this Court but to find a constitutional violation. *See Potter v. Miller,* 168 W.Va. 601, 603, 287 S.E.2d 163, 165 (1981) (finding that when an action "so closely touches a fundamental constitutional right ... [defendants'] right to remedy is clear"). The Supreme Court of California in *Hartzell v. Connell,* 35 Cal.3d 899, 911–12, 201 Cal.Rptr. 601, 609–10, 679 P.2d 35, 43–44 (1984), touched upon the essence of what a free public school system should mean when it found:

> "In guaranteeing 'free' public schools, ... [article XII, § 1] fixes the precise extent of the financial burden which may be imposed on the right to an education—none.... A school which conditions a student's participation in educational activities upon the payment of a fee clearly is *not* a 'free school.'
>
> "The free school guarantee reflects the people's judgment that a child's public education is too important to be left to the budgetary circumstances and decisions of individual families. It makes no distinction between needy and nonneedy families. Individual families, needy or not, may val-

ue education more or less depending upon conflicting budget priorities.

\* \* \* \* \* \*

> "The free school guarantee lifts budgetary decisions concerning public education out of the individual family setting and requires that such decisions be made by the community as a whole. Once the community has decided that a particular educational program is important enough to be offered by its public schools, a student's participation in that program cannot be made to depend upon his or her family's decision whether to pay a fee or buy a toaster." (Citations and a footnote omitted; emphasis in original).[16]

 Nor do we find persuasive the Board's argument that never in the history of this State has it been required to provide textbooks free of charge for all students. By narrowly focusing on the failure to provide textbooks in the past, the Board fails to embrace the full history surrounding the educational system in this State. Although Section 1 of Article XII provides textual support for the right to a free education, it is clear the framers intended and the populace continues to support the notion that all students are entitled to a basic level of education free of budgetary concerns. History is indeed very important, but it alone cannot be permitted to overwhelm or replace the constitutional provision in question. *See Stephens v. Chambers,* 34 Cal.App. 660, 168 P. 595, 596 (1917) ("[a] written Constitution ... cannot so deal with particulars as to meet or provide for every case or contingency which may arise"). Obviously, academic curriculum needs change and while teaching students using minimal materials may have been sufficient for our ancestors, newer methods of instruction using a vast supply of textbooks and other materials have supplanted earlier techniques. *See generally* Syllabus Point 4, *State ex rel. Smith, Governor v. Kelly,* 149 W.Va. 381, 141 S.E.2d 142 (1965) (noting that court should examine new conditions not in existence at time of adoption of Constitution to aid in constitutional interpretation). What may have been fundamental for a quality

---

**16.** We concur with the California Supreme Court's finding in this context only.

education in the past does not make it necessarily so now. Textbooks for modern students are a fundamental part of the learning experience. To find otherwise would ignore reality and, moreover, constitutional mandates.

■ Implicit in the Board's argument is the notion that because something was not done at the time the Constitution was adopted, then the present occurrence of an unforeseen event could not fit within the framers' intent.[17] Essentially, the Board is inviting this Court to adopt a static view of the West Virginia Constitution. Reasonable construction of our Constitution does not require static doctrines but instead permits evolution and adjustment to changing conditions as well as to a varied set of facts. Because it is a framework for governmental structure, a constitution is necessarily general to allow for needed flexibility. *See Reilly v. Ozzard,* 33 N.J. 529, 539, 166 A.2d 360, 365 (1960) ("[a] constitution does not resolve all policy problems ... [instead] it establishes the framework of government with such specific restraints as are thought to be of eternal value and hence worthy of immunity from passing differences of opinion"). This is the essence of a "living" constitution; to do otherwise would force us to subject 20th Century needs to 19th Century foibles.[18]

■ When the Constitution is silent on a particular issue, the solution cannot be found in a methodology that requires us to assume or divine the framers' intent on an issue which most likely was never considered. Rather, the solution must be found in a study of the specific provision of the Constitution and the best method to further advance the goals of the framers in adopting such a provision.

■ Balancing constitutional mandates with fiscal constraints while still maintaining quality educational programs has placed a tremendous burden on school systems to make difficult choices. We understand and sympathize with the Board concerning its dire financial straits. However, its extreme need is still no justification for a violation of rights of constitutional magnitude. *See Hartzell v. Connell,* 35 Cal.3d at 912, 201 Cal.Rptr. at 610, 679 P.2d at 44 (noting "financial hardship is no defense to a violation of the free school guarantee"). If serious financial problems are threatening the Board's ability to provide a quality education for all its students, then the Board may need to explore other alternatives for raising the needed revenue. Such possibilities might include raising public awareness and appealing again to the community for the passage of another excess levy or going to the Legislature and lobbying more effectively for necessary financial assistance. Another possible

17. To some extent, the historical practice argument of the Board is interesting. We do not doubt that a clearly established historical practice would be relevant to what the Constitution meant by "free schools," but it is precisely historical practice that we relied upon in distinguishing what was acceptable in colonial Virginia from what the framers adopted in our Constitution. Moreover, even if there was evidence of a past practice as urged by the Board, an historical practice that is so inconsistent with the letter of our Constitution that it would render impotent one of its most important provisions "would be so extraordinary that evidence for it would have to be convincing indeed." *United States v. Gaudin,* —— U.S. ——, ——, 115 S.Ct. 2310, 2317, 132 L.Ed.2d 444, 453 (1995).

18. "To adopt the view that the Constitution is static ... is to insist that the Constitution was created containing the seeds of its own destruction." *United States v. Calistan Packers,* 4 F.Supp. 660, 661 (N.D.Cal.S.D.1933). Thus, we must keep in mind that although " '[c]onstitu-

tional provisions do not change, ... their operations extend[ ] to new matters, as the modes of business and the habits of life of the people vary with each succeeding generation.' " *United States v. Calistan Packers,* 4 F.Supp. at 661, *quoting In re Debs,* 158 U.S. 564, 591, 15 S.Ct. 900, 909, 39 L.Ed. 1092, 1105 (1895). *See also Missouri v. Holland,* 252 U.S. 416, 433, 40 S.Ct. 382, 383, 64 L.Ed. 641, 648 (1920) ("[t]he case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago"); *State v. Hall,* 187 So.2d 861, 863 (Miss.), *app. dismd.,* 385 U.S. 98, 87 S.Ct. 331, 17 L.Ed.2d 196 (1966) ("[t]he Constitution is a living document for the operation and perpetuation of our government"). It is important that we remember the principle that "a constitutional provision should be liberally interpreted and, when possible, should be construed to meet changing conditions and the growing needs of the people." *Miro v. Superior Court for County of San Bernardino,* 5 Cal.App.3d 87, 98, 84 Cal.Rptr. 874, 880 (1970).

method may even be to undertake the arduous task of prioritizing and eliminating course offerings. These and like efforts are within the fair ambit of the Court's practical conception of what is within the Board's authority and are not called into question by our decision today. We, however, do not attempt to suggest what would be the best method considering our only task in this case is to determine the constitutionality of the book user fee.

In any event, financial needs for the West Virginia public school system fall exclusively within the province of the Legislature. In fact, in *State ex rel. Board of Education v. Manchin*, 179 W.Va. at 242, 366 S.E.2d at 750, we stated:

> "In *Pauley v. Kelly, supra*, we determined that the ultimate responsibility for maintaining a thorough and efficient school system falls upon the State. In *Pauley*, we cited approvingly the language of the Supreme Court of New Jersey in *Robinson v. Cahill*, 62 N.J. 473, 513, 303 A.2d 273, 294 (1973):
>
> > ' "Whether the State acts directly or imposes the role upon local government, the end product must be what the Constitution commands. *A system of instruction in any district of the State which is not thorough and efficient falls short of the constitutional command.* Whatever the reason for the violation, the obligation is the State's to rectify it. *If local government fails, the State government must compel it to act, and if the local government cannot carry the burden, the State must itself meet its continuing burden.*" '
>
> *Pauley*, 162 W.Va. at 697, 255 S.E.2d at 873 (emphasis added)." [19]

The dilemma faced by the Board is indistinguishable from any number of difficult choices that governmental agencies must make under our constitutional system. Section 1 necessarily exerts pressure on our Legislature and boards of education to make hard—and sometimes undesirable—decisions while staying within constitutional limitations. Thus, we are compelled to underscore that financial hardship is an insufficient basis for ignoring the West Virginia Constitution. The imposition of these difficult choices is an inevitable and unavoidable attribute that emanates from our Constitution.

Although we find our interpretive choice difficult, we believe that our interpretation is most faithful to the Constitution. Concededly, our interpretation limits the Legislature's and the Board's authority to carry out their mandate of providing "for a thorough and efficient system of free schools." The history of Section 1, to the extent informative, indicates that the framers saw the word "free" as part of a guarantee that education in West Virginia would remain user friendly and that the financial burden to achieve this purpose would be shared generally by the taxpayers of West Virginia. The context of Section 1 confirms this understanding of the framers' intent.

We pause to consider the implications of the Board's argument. Under the theory that the Board presents in support of its fee system, it is difficult to perceive any constitutional limitation on its authority to charge students short of a "tuition." Financial hardship clearly cannot be the appropriate test to be applied in defining "free schools." The basic task of the judicial branch is to determine whether the means used by the executive and legislative branches are within the reasonable scope and contemplation of our Constitution. To uphold the Board's contentions here, we would have to ignore both the letter and spirit of our Constitution. Admittedly, as we discussed above, courts in other jurisdictions have taken the long step down that road, giving greater deference and

**19.** See also *Kuhn v. Board of Education*, 4 W.Va. 499, 509 (1871), *overruled on other grounds Williams v. County Court*, 26 W.Va. 488 (1885), noting the Legislature's burden:

"From this clause it is plain, the people intended that the 'thoroughness' and 'efficiency' of the system of free schools, adopted by the legislature, should in no wise be prejudiced by want of ample means. They make it obligatory upon the legislature to provide for the support of such schools, not only 'by appropriating thereto the interest of the invested school fund,' & c., but also by 'general taxation on persons and property or otherwise,' thus placing in the hands of the legislature, for that purpose, plenary, if not absolute, power."

respect to financial expediency than to constitutional mandates. Indeed, the broad language in those cases has suggested the possibility of even greater expansions in their constitutional construction, but we decline to go beyond what our Constitution permits. To do so would require us to rewrite the Constitution, a task properly and exclusively reserved for the citizens of West Virginia. Until a rewriting is done, the citizens of West Virginia have the right to have their written word as expressed in our Constitution respected and honored.

■ Finally, our decision today need not create tension between the judiciary and the legislative and executive branches of our government. When acting within its legitimate constitutional sphere, judicial deference given to both the West Virginia Legislature and administrative bodies has been confirmed. *See Appalachian Power Co. v. State Tax Dept. of W. Va.*, 195 W.Va. 573, 466 S.E.2d 424 (1995). The practice of deferring to rationally based legislative enactments is a paradigm of judicial restraint. It demonstrates our respect for the institutional competence on a subject expressly assigned to the Legislature by the West Virginia Constitution and an appreciation of the legitimacy that comes from the Legislature and our school boards' political accountability in dealing with matters open to a wide range of possible choices. A look at history's sequence serves to show how today's decision keeps the Court on course, which is not in any way at odds with the rule of restraint to which this Court still wisely adheres.

■ To be specific, it does not follow, however, that in every instance this Court lacks authority and responsibility to review legislative and administrative attempts to alter what are alleged as constitutional mandates. This case has required us to consider our place in the design of state government and to appreciate the significance of judicial review in the whole structure of our Constitution. It cannot be denied that of the various structural elements in the Constitution, judicial review allows the judiciary to play a role in maintaining the design contemplated by the framers. To be sure, the resolution of specific cases, such as this one, has proved difficult, but judicial review has been established beyond question and, although we may differ in applying its principles, its legitimacy is undoubted. *Marbury v. Madison,* 1 Cranch 137, 2 L.Ed. 60 (1803). What Justice Scalia recently stated in *Plaut v. Spendthrift Farm, Inc.,* —— U.S. ——, ——, 115 S.Ct. 1447, 1453, 131 L.Ed.2d 328, 342 (1995), applies with equal force in West Virginia:

"Article III establishes a 'judicial department' with the 'province and duty ... to say what the law is' in particular cases and controversies.... The record of history shows that the Framers crafted this charter of the judicial department with an expressed understanding that it gives the ... Judiciary the power, not merely to rule on cases, but to *decide* them[.]" (Citation omitted; emphasis in original).

Accordingly, for the reasons discussed above, we affirm the judgment of the Circuit Court of Randolph County.

Affirmed.

MILLER, Retired Justice, sitting by temporary assignment.

ALBRIGHT, J., did not participate.